# In the United States Court of Federal Claims

No. 22-1271
(Filed:  19 March 2026)

```
*****************************************
MARGARET ABARE,                       *
                                      *
                Plaintiff,            *
                                      *
v.                                    *
                                      *
THE UNITED STATES,                    *
                                      *
                Defendant.            *
                                      *
*****************************************
```

*Morgan L. Bigelow*, Lubin, Enoch, & Bustamante, PC, of Phoenix, AZ, with whom was *Sara L. Faulman*, McGillivary Steele Elkin LLP, of Washington, DC, for plaintiff.

*Oliver McDonald*, Trial Attorney, Department of Justice, Civil Division, Commercial Litigation Branch, with whom were *Reginald T. Blades, Jr.*, Assistant Director, *Patricia M. McCarthy*, Director, *Brett A. Shumate*, Acting Assistant Attorney General, Department of Justice, and *David White*, Attorney, and *Joshua Hofer*, Attorney, Commercial & Appellate Litigation, United States Postal Service, all of Washington, DC, for defendant.

**OPINION AND ORDER**

**HOLTE, Judge.**

*Caveat manceps rei publicae*.[1]

This forewarning is hardly novel.  On 12 August 1986, President Ronald Reagan uttered his famous adage—"[T]he nine most terrifying words in the English language are:  I'm from the Government, and I'm here to help."  Ronald Reagan Presidential Library and Museum, *The President's News Conference*, 12 August 1986, available at https://www.reaganlibrary.gov /archives/speech/presidents-news-conference-23.  Since then, government contracting has grown to pervade nearly every facet of the American economy, and so too has government contractors' need to beware of the contracts they presume to have entered.

As government contracting is funded by the people for the people, "[contractors] must turn square corners[2] when they deal with the [g]overnment."  *Rock Island, A. & L. R. Co. v.*

---

[1] "Let the contractor for the government beware."

[2] "Turning square corners" is the converse of "cutting corners," which originated from when carriage drivers took shortcuts by diagonally crossing a sharp turn.  Though carriage drivers saved time by taking these shortcuts, they

*United States*, 254 U.S. 141, 143 (1920) (Holmes, J.).  "But it is also true, particularly when so much is at stake, that 'the [g]overnment should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (Roberts, C.J.) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) (Gorsuch, J.) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").  Yet, "the Supreme Court has recognized that any private party entering into a contract with the government assumes the risk of having accurately ascertained that he who purports to act for the government does in fact act within the bounds of his authority."  *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)) (other citations omitted).  This means, even if a government actor misrepresented the extent of their authority, the *contractor* is charged with knowing the true extent of the government actor's authority and bears all legal risk if the actor exceeds their authority.  Such is the concern here.

Ms. Abare—a mail handler who suffered from a spinal injury—filed a grievance at the Equal Employment Opportunity Commission ("EEOC") against the United States Postal Service ("USPS") alleging discrimination based on her disability.  During the pendency of her grievance, an administrative judge at the EEOC ordered party representatives with authority to discuss settlement.  After plaintiff's counsel conveyed its first settlement proposal, a Postal Service attorney agreed to discuss settlement over a phone call.  Following the phone call, plaintiff's counsel asked via e-mail what the Postal Service's current settlement offer was.  The Postal Service attorney responded:  "$180[,000] inclusive of comp[ensation] and att[orney's] fees."  Plaintiff's counsel replied:  "My client accepts this offer."  Despite this facially lucid settlement discussion and in spite of the EEOC administrative judge's order requiring the government negotiator to have settlement authority, the Postal Service attorney was not authorized to offer a settlement over $5,000 and did not attempt to receive proper authorization for a settlement of $180,000—plaintiff never asked the actual extent of the Postal Service attorney's settlement authority either.  *See infra* Sections I.A, IV.A; *see also infra* Section IV.A n.4 (noting the Postal Service attorney admitted to "universally ignoring" the administrative judge's Order at his deposition).

Unfortunately, the Postal Service does not publish any memorandum detailing the actual extent of its agents' settlement authority, raising the question:  how can contractors "accurately ascertain[] that he who purports to act for the government does in fact act within the bounds of his authority"?  *See Schism*, 316 F.3d at 1278.  The absence of such information, plaintiff's failure to inquire about the Postal Service attorney's authority, and the parties' email correspondences prompted plaintiff to assume the attorney had authority.  This assumption, however, was in vain.[3]  As the government agreed at oral argument, if the Postal Service

---

invited risks and dangers by doing so.  Instead of taking shortcuts when dealing with the government, Justice Holmes urged the people to "turn[] square corners" by complying with, *inter alia*, legal requirements, contractual duties, and due process.

[3] This is not the first instance of government representatives promising more than they have authority to offer.  In the 2024 *Yifrach* decision, the Court noted a history of at least nine other cases concerning law enforcement officers making contract promises beyond their DOJ authorization manual.  *Yifrach v. United States*, 169 Fed. Cl. 33, 68 n.7 (2024) (citing *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 374–76 (2004), *Tracy v. United States*, 55 Fed. Cl.

published its settlement authority delegation processes (like the Department of Justice does), the Postal Service would avoid disputes like the instant case regarding whether a government actor had requisite settlement authority. *See infra* Section IV.A. Given plaintiff agreed at oral argument (1) apparent authority is insufficient and (2) the Postal Service's attorney did not possess actual authority to bind the government to a settlement agreement over $5,000, the Court grants the government's Motion for Summary Judgment.

## I.    Background

### A.    Factual History

The Court detailed the factual history of this case in its 25 September 2023 Opinion and Order, ECF No. 17:

> Plaintiff, Margaret Abare, was a United States Postal Service ("USPS") mail handler in Maricopa County. Compl. ¶¶ 2–3, ECF No. 1. She submitted an Equal Employment Opportunity ("EEO") complaint related to her USPS employment in 2018. *Id.* ¶¶ 3, 11. On 20 November 2020, the EEO Commission ("EEOC") administrative judge "issued an order scheduling an initial conference," which required the parties to "discuss specific settlement proposals" and the representatives to "have the authority to settle the complaint during the Initial Conference." *Id.* ¶ 12 (quoting Compl. Ex. A ("EEOC Order Scheduling Initial Conference") at 2, ECF No. 1-1). An attorney representing plaintiff emailed USPS counsel on 11 December 2020, providing "specific settlement terms, including waiver and withdrawal of claims, monetary payment amounts, and the expiration of the offer." Compl. ¶ 13; *see* Compl. Ex. B ("Pl.'s 11 Dec. 2020 Email") at 1, ECF No. 1-2. The administrative judge stayed the proceedings "to allow the parties to mediate the matter." Compl. ¶ 15. Plaintiff's counsel made another settlement offer on 7 April 2021, "providing a waiver and withdrawal of claims, a provision to facilitate [plaintiff]'s retirement application, and the monetary payments." *Id.* ¶ 17. On 17 May 2021, plaintiff's attorney and USPS counsel discussed settlement over a phone call, and USPS counsel represented USPS "was willing to settle the matter for $180,000." *Id.* ¶ 19; *see* Compl. Ex. C ("May 2021 Emails") at 3–4, ECF No. 1-3. Over email following the call, plaintiff's attorney asked, "[W]hat is your client's current offer to my client?" May 2021 Emails at 3; Compl. ¶ 20. USPS counsel responded, "$180[,000] inclusive of comp[ensation] and att[orney's] fees." May 2021 Emails at 3; Compl. ¶ 20. Plaintiff's attorney replied, "My client accepts this offer, I think we can go ahead with the filing you mentioned to the judge letting him know that it's only a matter of finalizing it." May 2021 Emails at 3; Compl. ¶ 20. In drafting the filing for the administrative judge, USPS counsel requested use of the language "agreement in principal." May 2021 Emails at 1. Plaintiff and USPS filed a joint report the same day, stating: "[T]he parties

679, 682–84 (2003), *Humlen v. United States*, 49 Fed. Cl. 497, 504 (2001), *Toranzo-Claure v. United States*, 48 Fed. Cl. 581, 583–84 (2001), *Doe v. United States*, 48 Fed. Cl. 495, 501–03 (2000), *Khairallah v. United States*, 43 Fed. Cl. 57, 61–64 (1999), *Roy v. United States*, 38 Fed. Cl. 184, 191–92 (1997), *Cruz-Pagan v. United States*, 35 Fed. Cl. 59, 63 (1996), *SGS-92-X003 v. United States*, 85 Fed. Cl. 678, 702–06 (2009)). So too is the case here.

are happy to inform the [EEOC] that they have recently been able to enter an agreement in principle." Compl. Ex. D ("17 May 2021 J. Report") at 2, ECF No. 1-4.

"On July 19, 2021, [plaintiff's attorney] informed [USPS counsel] that [p]laintiff had submitted a disability retirement application in order to comply with the settlement agreement." Compl. ¶ 22. Plaintiff clarified at oral argument the government did not communicate with plaintiff between May and August. *See* 24 May 2023 Oral Arg. Tr. ("Tr.") at 76:2–17, ECF No. 16 ("THE COURT: What occurred between May and August? [PLAINTIFF:] So after the parties on May 17th filed the notice of settlement, in July, [plaintiff's attorney] informed [USPS counsel] that [p]laintiff had submitted a disability retirement application . . . . We did not hear from the agency again until late August when we were informed that the agency is unwilling to enter into previously discussed settlement agreements."). "On August 25, 2021, [USPS counsel] alleged for the first time that the settlement was pending 'final settlement authority' and cited different factual issues [USPS] suddenly found with [p]laintiff's EEO complaint." Compl. ¶ 23. On 24 September 2021, USPS counsel informed plaintiff USPS "is unwilling to enter into the previously discussed settlement agreement." *Id.* ¶ 24. "On October 22, 2021, pursuant to 29 C.F.R. § 1614.504, [p]laintiff informed [USPS] that it had breached their reached settlement agreement and requested that [USPS] specifically implement the agreement terms." *Id.* ¶ 28. USPS determined there was no binding settlement agreement. *Id.* ¶¶ 6, 29. Plaintiff appealed USPS's determination to the EEOC, and the EEOC affirmed. *Id.* ¶¶ 6, 29–30; *see* Compl. Ex. E ("15 June 2022 EEOC Decision"), ECF No. 1-5. USPS "has not issued any payment to [p]laintiff." Compl. ¶ 31.

## B.    Procedural History

In response to plaintiff's Complaint, the government moved to dismiss asserting: (1) plaintiff's complaint was barred by claim preclusion; and (2) plaintiff failed to plausibly allege the existence of a contract with the United States. *See* Gov't's Mot. to Dismiss for Failure to State a Claim ("MTD"), ECF No. 6. After holding oral argument on the government's Motion to Dismiss on 24 May 2023, the Court denied the government's Motion to Dismiss because "plaintiff ha[d] plausibly alleged both offer and acceptance and actual authority" for the purposes of a motion to dismiss. *See* 25 Sept. 2023 Opinion and Order at 3, 18–19, ECF No. 17. The Court, however, noted: (1) "the government propose[d] a possible scenario [regarding] USPS counsel ha[ving] authority only for the initial conference and did not have any for the immediately following negotiations"; and (2) although "USPS counsel might not always have authority to settle cases, given the administrative judge's order requiring settlement authority, having authority to settle this particular case may have been integral to USPS counsel's duties." *Id.* at 18–19. Consequently, the Court ordered limited discovery into the issue of whether Postal Service counsel had authority to enter into the alleged 17 May 2021 settlement agreement. *Id.* at 19.

During limited discovery, in response to plaintiff's request for "all communications related to, referencing, or regarding settlement of [plaintiff]'s complaint during the relevant time period," the government invoked the work product doctrine and attorney-client privilege over seventy documents and correspondingly noted each invocation on its privilege log. *See* Pl.'s Renewed Mot. to Compel ("MTC") Ex. A ("Def.'s Resp. Obj. to Pl.'s First Set Req. Prod.") at 2, ECF No. 25-1; *id.* Ex. B ("Government Privileged Documents Log, January 22, 2024"), ECF No. 25-2; Gov't's Opp'n to Mot. to Compel ("Opp. to MTC") at 2 n.1, 4, ECF No. 27.  The parties subsequently discussed the government's privilege log on a phone call, and plaintiff requested the government's basis for withholding several documents.  Opp. to MTC at 4, 8.  The government provided its reasoning for invoking privilege for each document and asserted none of the withheld documents concerned the Postal Service attorney's settlement authority.  *See id.*

As the parties continued to disagree about the propriety of the government's privilege assertions, plaintiff moved to compel production of documents related to the settlement of plaintiff's complaint, arguing:  (1) the government's internal communications regarding settlement authority are not subject to the attorney-client or work product doctrine; (2) the government withheld relevant, nonprivileged communications which conveyed settlement authority to Postal Service counsel; and (3) the government has waived privilege as to settlement authority.  *See* MTC, ECF No. 25.  After the government's response in opposition and plaintiff's reply, the Court held oral argument on plaintiff's Motion to Compel (and stayed the impending motion for summary judgment deadline).  *See* 5 April 2024 Order, ECF No. 31; *see generally* Opp. to MTC; Pl.'s Reply in Supp. of Mot. to Compel ("Reply"), ECF No. 30.  On 17 October 2024, the Court determined, as a legal matter, "a conveyance of settlement authority from the government is not confidential . . . no[r] legal advice," and held "to the extent any of the government's withheld documents convey settlement authority, these documents are not privileged and are therefore discoverable."  17 Oct. 2024 Order at 16–18, ECF No. 34. "Although the Court agree[d] with plaintiff on the inapplicability of the attorney-client privilege to conveyances of settlement authority," the Court found:

> Not only has the government *repeatedly affirmed no document in its privilege log from the relevant timeframe conveys settlement authority to [Postal Service] counsel*, *see* [2 July 2024 Oral Arg. Tr.] at 51:6–21[, ECF No. 33] ("THE COURT: And to confirm, no documents transmit settlement authority to [Postal Service counsel]?  [THE GOVERNMENT]:  No documents transmit settlement authority to [Postal Service counsel] in the time frame that opposing counsel would be looking at . . . . [Postal Service counsel] did not have authority at the time at interest . . . so none of these documents involve . . . in that specific time period [Postal Service counsel] having any sort of authority."), but at oral argument, plaintiff could not identify any allegedly privileged documents from the relevant timeframe it believes contain such a conveyance.

*Id.* at 18 (emphasis added).  The Court accordingly denied plaintiff's Motion to Compel.  *See id.* at 23.

After the Court denied plaintiff's Motion to Compel, the parties proposed a schedule to resume briefing on dispositive motions.  8 Nov. 2024 Joint Status Report, ECF No. 35.  The

Court adopted the parties' schedule the same day.  8 Nov. 2024 Order, ECF No. 36. Correspondingly, the government moved for summary judgment on 6 February 2025.  *See* Gov't's Mot. for Summ. J. ("MSJ"), ECF No. 37.  Plaintiff filed its response to the government's motion on 28 February 2025.  *See* Pl.'s Response to Gov't's MSJ ("Pl.'s Resp."), ECF No. 39. On 14 March 2025, the government filed a reply in support of its Motion for Summary Judgment.  *See* Gov't's Reply ISO MSJ ("Gov't's Reply"), ECF No. 40.  The Court then held oral argument in Phoenix, AZ on 28 October 2025.  *See* 7 Aug. 2025 Order Setting Oral Argument, ECF No. 43.

## II.    Parties' Arguments

In its Motion for Summary Judgment, the government argues plaintiff's "breach [of contract] claim fails as a matter of law," given "[plaintiff] has failed to demonstrate the fulfillment of a single required element of a breach of contract case."  Gov't's MSJ at 1.  Despite "plaintiff [bearing] the burden to show '(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract,'" the government contends plaintiff "failed to adduce facts supporting her allegations or point to law supporting" these four elements.  *Id.* at 7 (citations omitted).

First, the government disputes the presence of element (1)—mutuality of intent to contract—because the Postal Service counsel wished the negotiation "discussion be described as an 'agreement in principle' . . . a characterization to which [plaintiff's counsel] agreed."  *See* Gov't's MSJ at 8 (quoting Compl. Ex. C. at 1–2).  The government argues, "[a]n agreement in principle is a term of art, which this Court has recognized refers to an unenforceable preliminary agreement preceding a formal contract"; it indicates "the parties are on track to achieve a settlement, but it does not mean that they have entered into a settlement agreement."  *See id.* at 8–9 (quoting *Angel v. United States*, 172 Fed. Cl. 102, 131 (2024) (internal citations omitted)). In response, plaintiff submits there is a "genuine dispute of material fact as to whether [counsel for plaintiff and the government] intended to enter into a fully binding agreement on May 17, 2021 which precludes granting summary judgment."  Pl.'s Resp. at 7.  Plaintiff notes "the parties' discussed the settlement during a phone call, followed up with a discussion of the material terms over e-mail, and filed a joint status report with the [administrative judge] expressing they had reached an 'agreement in principle,'" which plaintiff asserts is "objective evidence that the parties[] mutually intended to enter the Settlement," especially considering the parties dispute whether "[t]he parties . . . start[ed] over from ground zero during every settlement discussion."  *Id.* at 7–9.  The government replies, "the parties used the agreement in principle language to express that the settlement was not final, and there could not be recission between the time the government agreed to the settlement and the time those terms were to be reduced in writing because the agreement was immediately defined as in principle by both parties."  *See* Gov't's Reply at 2–3 (cleaned up).

Second, the government argues the alleged settlement agreement lacks element (2)—consideration—because "the agreement was an 'agreement in principle,' not a final agreement."  *See* Gov't's MSJ at 9 (citing *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202–04 (Fed. Cir. 1992)).  The government states "[a]n agreement in principle is an

agreement that is on track for settlement and does not consist of a 'bargained for' promise—it sets out the *possibility* of a future bargained for promise." *See id.* at 9 (quoting *Angel*, 172 Fed. at 131) (emphasis in original). Plaintiff responds, citing to a prior opinion from this court, "[s]ufficient consideration in a settlement agreement with the United States is established when there is a benefit to the government. Pl's Resp. at 8 (citing *National Micrographics Sys. v. United States*, 38 Fed. Cl. 46, 51 (1997)). Here, plaintiff argues, "the parties exchanged multiple written settlement offers, the last of which prior to the May 17, 2021 settlement exchange was presented by [plaintiff's counsel] via email on April 7, 2021. . . . The only remaining material term in dispute during the May 17, 2021 phone call and subsequent email exchange was the amount of the monetary payment USPS was to pay [plaintiff]. That term was resolved, leaving the parties mutually bound to the terms of the agreed upon settlement." *See id.* at 8–9. The government replies plaintiff "does not refute [the] argument that an agreement in principle does not consist of the 'bargained for' promise required by consideration." Gov't's Reply at 3. Further, the government argues plaintiff's statements regarding the settlement discussions "[are] directly contradicted by Mr. Tita's testimony" given "Mr. Tita's understanding was that the settlement discussions were not cumulative and that the monetary component was the only component addressed by the email exchange." *Id.* (cleaned up).

Third, the government further asserts there is no objective evidence of element (3)—offer and acceptance—because "the alleged 'agreement in principle' was the only extant step toward settlement [and therefore] offer and acceptance did not occur and no contract existed between the Postal Service and [plaintiff]." Gov't's MSJ at 12. The government argues "the parties had reached only an 'agreement in principle' [and] that no 'fully-executed settlement agreement' was yet extant . . . [because] [t]he lack of 'sufficiently definite terms' in the purported agreement display[ed] a lack of intent to form a binding contract." *See id.* at 14. Plaintiff, in its response, contends "the parties' e-mail exchange shows objectively that there was an offer and acceptance." Pl.'s Resp. at 10. Specifically, plaintiff highlights "the e-mail exchange even uses the specific buzzwords: when [plaintiff] asks for [the government's] 'current offer,' [Postal Service counsel] provides the terms, which she then promptly replies with 'My client accepts.'" *Id.* at 11 (internal citations omitted). Plaintiff also argues "the government's assertion that the agreement was merely 'in principle' and lacked material terms is open to dispute [because] [s]ome courts have found that the two 'material terms' of a parties' settlement agreement are the amount of the settlement and the release of all claims." *See id.* at 11 (citing *Hetherington v. Ford Motor Co.*, 849 P.2d 1039, 1043 (Mont. 1993); *Mears v. Safeco Ins. Co.*, 888 F. Supp. 2d 1048, 1062 (D. Mont. 2012); *Davis v. City of Idaho Falls*, No. 14-550, 2019 WL 7759127, at *9–12 (D. Idaho Dec. 27, 2019). The government replies plaintiff "contradicts her earlier concession about the meaning of an 'agreement in principle' as acknowledged by multiple cases in this [c]ourt . . . and states that the assertion that the agreement was 'in principle' was 'open to dispute,'" but "[a]n agreement that is 'in principle', even if it does contain material terms, cannot be a final agreement because it is 'in principle'—not finalized." Gov't's Reply at 4. "[A]lthough the Court need not reach this issue," the government proposes "the alleged settlement agreement also lacked key terms necessary to show offer and acceptance." *See id.* at 5.

Lastly, the government argues the contract fails under element (4)—actual authority on the part of the government's representative to bind the government in contract—because plaintiff "can identify no evidence of authority and therefore fails to satisfy the final element of a contract

with the United States." Gov't's MSJ at 14. According to the government, "during the time at issue, when [plaintiff] says the alleged settlement agreement took place, [Postal Service Counsel] never had the authority to settle the case for $180,000" and counsel "could not be authorized by an appropriate official because [he] did not subsequently discuss the agreement in principle with anyone authorized to settle." *See id.* at 16 (citations omitted). As a result, the government contends "[b]ecause no actual authority, express or implied, existed for [Postal Service counsel] to settle [plaintiff]'s case, no contract was formed between [plaintiff] and the Government." *Id.* Plaintiff responds the Postal Service counsel made "inconsistent and contradictory statements regarding his settlement protocols" and this "create[d] a genuine dispute of material fact as to whether he had authority to bind the government to the settlement." *See* Pl.'s Resp. at 12. Plaintiff asserts, "[i]n his deposition testimony, [Postal Service counsel] states that due to a major reorganization around the time the Joint Report was drafted, the proper channels to receive authority to settle for amounts over $50,000 was unclear. . . . Yet, while [Postal Service counsel] testified that he could not possibly have received settlement authority to enter into the May 17, 2021 Settlement since he did not even know who from the Operations Department he needed to seek authority from at that time, he was able to 'receive all the proper authority to offer the following settlement,' on October 18, 2021." *See id.* at 12–13 (quoting Pl. App'x at 68). The government replies "[Postal Service counsel] did not make an inconsistent statement" in his deposition testimony, "and the 'evidence' that [plaintiff] points to as showing a prior inconsistent statement is based on a fundamental misunderstanding of the structure of settlement authority within the [g]overnment." *See* Gov't's Reply at 6–7. Per the government, "the undisputed fact that [Postal Service counsel] later received 'all the proper authority' confirms that [Postal Service counsel] did not have settlement authority on May 17 2021," and "[i]f [Postal Service counsel] had authority on May 17, 2021, he would not need to obtain that authority later" in October 2021. According to the government, "[Postal Service counsel] did not have settlement authority on May 17, 2021, but later submitted for consideration through his channels of authority a proposed settlement agreement and was able to make another offer on October 18, 2021." *Id.* at 7–8. "No actual authority, express or implied, existed for [Postal Service counsel] to settle [plaintiff]'s case, and as such," the government contends "no contract was formed between [plaintiff] and the Government." Gov't's Reply at 9.

## III.    Applicable Law

### A.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A court shall not grant summary judgment if "the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is considered genuine if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255). The party seeking summary judgment bears the burden of establishing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has met this burden, the

burden shifts to the non-movant who must present sufficient evidence to show a dispute over a material fact allowing a reasonable factfinder to rule in its favor. *Anderson*, 477 U.S. at 256–57. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 248).

### B.        Breach of Contract

To establish a breach of contract claim, plaintiff must show a valid contract between parties, an obligation or duty arising from the contract, breach of that duty, and damages caused by that breach. *See San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). "An express or implied-in-fact contract with the United States requires: '(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) *actual authority* on the part of the government's representative to bind the government in contract.'" *See Goodnow v. United States*, 2022 WL 16943986 at *1 (Fed. Cir. Nov. 15, 2022) (quoting *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)) (emphasis added). While contractual formation elements (1) through (3) generally apply to all contracts, element (4)—requiring express or implied actual authority to contract—is unique to government contracts. *See id.*; *Salles v. United States*, 156 F.3d 1383, 1384 (Fed. Cir. 1998); *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1401 (Fed. Cir. 2016) ("[T]he Government is immune to actions of its agents who merely possess apparent authority" which "exists when an agent with no actual authority holds himself out to have such authority to another's detriment.").

### IV.        Whether the Agreement in Principle is a Binding Settlement Agreement

The Court starts by evaluating whether plaintiff "ma[d]e a showing sufficient to establish the existence of [a binding contract with the government], and on which [plaintiff] will bear the burden of proof at trial." Gov't's MSJ at 6–7; Tr. at 5:19–23 ("[THE COURT:]  [T]he government, in its motion for summary judgment, argues the government is not bound to any other contract or settlement agreement, correct?  [THE GOVERNMENT]:  That's correct, Your Honor."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (requiring the non-movant to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Plaintiff agrees it "bears the burden of proof to show an enforceable contract with the government," and "although the government bears the burden on summary judgment, the burden may be discharged by showing that there's an absence of evidence to support the nonmoving party's case." Tr. at 6:14–7:2, 7:14–19 (plaintiff noting agreement with the Court's questions confirming the legal standard for summary judgment); *see also* Tr. at 7:3–9 (noting plaintiff's agreement if "the government were to argue that there was an absence of evidence to support plaintiff's case, the burden would shift to plaintiff to affirmatively proffer evidence that would show that there's some dispute of material fact that would prevent summary judgment."); Tr. at 5:24–6:3 (noting plaintiff's agreement, should the Court determine there is no enforceable contract and grant the government's Motion, the Court would have to dismiss the case). Both parties further agree plaintiff bears the burden to prove the four requirements for an enforceable contract with the government:  (1) mutuality of intent; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative. *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003); Gov't's MSJ at 7; Tr. at 10:19–11:3 (noting

plaintiff's agreement of the elements of contract formation regardless of an express or implied contract). Plaintiff also agrees whether the parties' discussions and emails satisfy these four requirements is a legal determination suitable for summary judgment. Tr. at 91:10–18; *see Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) ("Contract interpretation is a matter of law and thus amenable to decision on summary judgment."); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998).

While the government argues "none of the [four] elements are met here," the government suggests its argument regarding element (4)—that if there was a settlement offer, "[Postal Service counsel] would lack authority to make it"—"is the cleanest" argument. *See* Tr. at 58:7–11; *see also* Tr. at 58:2–7 ("THE COURT: The issue, though, . . . I guess what you're saying is twofold. One is that there were other terms to make it a binding offer and then, two, that he also lacked authority to make a binding offer in that range. [THE GOVERNMENT]: Yes, Your Honor."). Thus the Court starts its investigation by determining whether the Postal Service counsel had authority to bind the government to the alleged settlement agreement.

### A. Whether Plaintiff Has Satisfied Contractual Formation Element Prong (4)— Actual Authority to Bind the Government

The Court first reviews whether Postal Service counsel had authority to bind the government to the alleged settlement authority. Contractual authority may manifest as apparent authority or actual authority. *See Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1401 (Fed. Cir. 2016). Apparent authority "exists when an agent with no actual authority holds himself out to have such authority to another's detriment." *Id*. While apparent authority may suffice for corporate contracts, "the Government is immune to actions of its agents who merely possess apparent authority." *Id.* Plaintiff further agreed at oral argument apparent authority could not establish a contract with the government. Tr. at 11:4–15 ("THE COURT: So apparent authority could not establish a contract with the government. [PLAINTIFF]: Correct.").

As apparent authority is insufficient to bind the government, the Court assesses whether Postal Service counsel, Mr. Tita, had actual authority to bind the government. Though actual authority may manifest in two forms—express actual authority and implied actual authority— "the parties agree that the central issue is whether Mr. Tita had *implied* actual authority to bind the government to the settlement agreement in principle." Tr. at 12:11–22. In determining this issue, plaintiff agreed it bears the "burden of showing the government agent had authority to enter into the alleged agreement" and is charged with "having accurately ascertained that he who purports to act for the government does, in fact, act within the bounds of his authority." Tr. at 12:23–14:10. As a result, plaintiff agrees "it's plaintiff who has the duty to inquire about Mr. Tita's maximum settlement authority and bears the risk of a response that is either ambiguous or even wrong." Tr. at 15:24–16:20. At oral argument, however, plaintiff acknowledged there is no evidence showing plaintiff inquired about Mr. Tita's settlement authority—except the EEOC administrative judge's order requiring Mr. Tita to have settlement authority. Tr. at 17:3–9.

In its 25 September 2023 Opinion, the Court noted the outstanding issue of whether the EEOC administrative judge's order requiring settlement authority could create actual authority.

25 Sept. 2023 Opinion at 19, ECF No. 17.  As it was not briefed and because no settled precedent existed on whether an administrative judge's order could confer settlement authority, the Court did not dismiss plaintiff's complaint.  *Id.*  After limited discovery, at oral argument for summary judgment, plaintiff confirmed the EEOC administrative judge's order could not confer actual authority to Mr. Tita:

> [THE COURT:]  [I]n the current briefing, plaintiff did not cite any case law or statute or regulation showing that the [administrative judge]'s order could create implied actual authority.  You agree, and I think we already talked about this, that there is no authority, that the [administrative judge]'s order could not create any authority, correct?
>
> [PLAINTIFF]:  That's correct.

Tr. at 23:3–15.[4]  Plaintiff further agreed it did not raise any suggestion the administrative judge Order conferred settlement authority in briefing.  Tr. at 23:3–15 ("THE COURT:  Regarding any argument that the [administrative judge] order did create some authority or was part of a binding contract, you're not making that now or it's been waived?  [PLAINTIFF]:  Correct.").  Setting aside its inability to create settlement authority, the Court notes the Postal Service admits the words of the EEOC administrative judge are "universally ignored."  At his deposition, Mr. Tita says the "verbiage that [plaintiff's counsel] is referring to here [from the EEOC administrative judge Order] is universally ignored by both parties.  I've never had a Judge enforce it . . . I can't say things have changed, but I was doing EEOC work in 2021.  This is generally ignored by both parties."[5]  Def. App'x at 20:4–19 (Tita Dep. Tr.).

Instead of inquiring about Mr. Tita's settlement authority contemporaneous with the settlement emails, plaintiff assumed the agreement in principle indicated "a settlement had been reached by the parties and that a formally executed document would follow," Tr. at 19:13–25, and "assumed that . . . [Mr. Tita] did have proper authority from whoever he needed authority from to offer that settlement agreement."  Tr. at 22:3–15.  Notwithstanding these assumptions, plaintiff maintains "[t]he discovery process, and specifically Mr. Tita's deposition testimony, confirms that there is a genuine dispute of material fact as to whether Mr. Tita had authority from his client to settle with [plaintiff]."  Pl.'s Resp. at 1, 12–13.  Specifically, plaintiff maintained at oral argument:

---

[4] *See also* Tr. at 11:23–12:10 ("[THE COURT:]  [L]ooking back at the 2023 order, I think we had some questions then, and perhaps now, related to the administrative judge's order that required authority for settlement.  You agree that the administrative judge's order in this case could not confer, in and of itself, express actual authority?  [PLAINTIFF]: That is correct, Your Honor.  The order just required the representative for the Postal Service to have authority to settle the case.  THE COURT:  But no authority could come from that in itself.  [PLAINTIFF]: That is correct.").

[5]  It is rare for a government agency to "universally ignore" the words of an Order—but it is far rarer for a government agency to *admit* to "universally ignoring" an Order in sworn testimony.  The Court reminds the Postal Service of "the basic proposition that all orders and judgments of courts must be complied with promptly.  If a person to whom a court directs an order believes that order is incorrect, the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.  Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."  *Maness v. Meyers*, 419 U.S. 449, 458 (1975).

> Mr. Tita's deposition testimony explained that there's three steps in order to receive authority to enter into the settlement agreement. First was, within the Legal division, he needed his supervisor's authority to submit the proposed agreement to the client.  And then on the client side there was two departments that he needed to receive authority from, Operations and Labor.   At the time, due to the reorganization within the USPS, he was not aware of the designated individual within the Operations department.  So he proceeded with the Labor department.  But then later, for his October 18th settlement offer, he claims that he still did not know who within the Operations department had authority.  So he waived -- or he didn't -- that was no longer a requirement in order to submit the October 18th [offer].
>
> . . .
>
> I think the point is [the] internal procedure is not followed unless it's convenient for the Postal Service.

Tr at. 24:5–25:19.  All Mr. Tita testified to in his deposition was, as plaintiff noted at oral argument, "he had standing authority up to 5 grand."  Tr. at 28:12–24.

Despite stating a genuine issue of material fact existed regarding whether Mr. Tita had the requisite settlement authority, plaintiff admitted at oral argument there is no evidence in the record showing Mr. Tita had settlement authority of $180,000 for the agreement in principle:

> THE COURT:  But based on this discussion, it seems clear, based on his deposition and the processes internally, that there's no way that [Mr. Tita] had authority before May of 2021.
>
> [PLAINTIFF]:  That is correct, Your Honor.

Tr. at 39:2–7.  After acknowledging no evidence showed Mr. Tita had authority for the agreement in principle, plaintiff argued Mr. Tita "tried to later ratify the [agreement in principle in the] May 2021 emails."  Tr. at 39:14–17 ("THE COURT: So is it plaintiff's position, then, that he tried to later ratify the May 2021 emails in order to have the authority be engaged? [PLAINTIFF]: Yes, that would be accurate.").  Even under this argument, however, plaintiff conceded no evidence existed regarding ratification:

> [THE COURT:]  [Do] you have evidence of that?
> [PLAINTIFF]:  Are you asking for specific evidence regarding ratification?
> THE COURT:  Yeah.  Well, I mean, do you have evidence based on his deposition, that [Mr. Tita] was seeking and received authority after May of 2021 in order to have made the contract enforceable?
> [PLAINTIFF]:  No, Your Honor.

Tr. at 39:18–40:1.  Given plaintiff admitted no evidence supports Mr. Tita having requisite settlement authority—or the agreement in principle later being ratified—the Court sought to confirm with plaintiff Mr. Tita did not have requisite settlement authority to make the agreement

in principle enforceable, to which plaintiff agreed.  Tr. at 40:2–7 ("THE COURT:  But you agree, though, just to clarify, that if the enforceable contract was May of 2021, . . . that there's zero evidence that [Mr. Tita] had any authority to have made that contract enforceable? [PLAINTIFF]:  Yes, Your Honor.").

As further confirmation, plaintiff acknowledged, although the Area Vice President (or, as the government stated, "somebody at the vice president level") must designate authority for the $180,000 settlement to Mr. Tita, *see* Tr. at 86:9–21, Mr. Tita never communicated with anyone of vice president level.  Tr. at 86:22–87:2 (THE COURT:  And you agree, [counsel for plaintiff], that there's . . . nothing in the record to indicate that Mr. Tita had any communication with someone of the area vice president or vice president level?  [PLAINTIFF]: No, Your Honor -- or that was correct, yes, that there's no communication . . .").  Plaintiff also agreed no communications on the privilege log are with those who could have designated settlement authority of $180,000 to Mr. Tita.  Tr. at 87:3–6 ("THE COURT:  And you agree that even in the privilege log that there's no communication with anyone who could have given authority up to 180,000?  [PLAINTIFF]: Correct.").

Based on the record evidence and plaintiff's statements at oral argument, no genuine issue of material fact exists as to whether Mr. Tita had settlement authority of $180,000.  At most, Mr. Tita had settlement authority of up to $5,000, per his deposition testimony, and the Law Department had settlement authority of up to $50,000, per internal settlement guidelines. Def. App'x at 1–4 (Postal Service Memoranda regarding "Authority Limits and Procedures for Settlement of Employment Disputes" dated 20 November 2015 and 22 June 2021); *id.* at 72:13–23 (Tita Dep. Tr.).  Based on record evidence, Mr. Tita never consulted anyone at the vice president level who could designate to him the requisite settlement authority of $180,000 and never sought ratification of the agreement in principle.[6]  "Where an approving official exceeds his authority, the government can disavow the official's words and is not bound by [the] contract." *New Am. Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1080 (Fed. Cir. 1989).  In short, it is undisputed Mr. Tita exceeded his authority, and it is also undisputed the government may disavow the agreement in principle and "is not bound by [any] contract."[7]  *Id.*  Accordingly,

---

[6] These facts form the basis for the Court's maxim introduced *supra*:  *caveat manceps rei publicae*.  The government acting through an agent can legally—and without repercussion—conduct settlement negotiations exceeding designated settlement authority.  Based on binding legal precedent, the government can also charge plaintiff with knowing the extent of a government actor's settlement authority.  It follows then—the people must beware when dealing with the government.  Counsel for the government in this case agreed:  "I would be wary of agreements that are not signed just because . . . an oral agreement or an agreement from a series of emails is much less likely to have been approved through . . . proper channels within the agency.  Certainly, . . . there are procedures for receiving authority and . . . a line attorney does not have authority, as a general matter, to settle this sort of case."  Tr. at 69:4–20.

[7] Plaintiff emphasized at oral argument the crux of this case is not about Mr. Tita lacking the requisite settlement authority, but rather "that the Postal Service had internal procedures to receive authority that they were not following, and they were also not following procedures required by the administrative judge in order to receive the authority necessary to comply with the order."  Tr. at 40:12–16.  Specifically, plaintiff explained "[a]n attorney for the Postal Service agreed and told [plaintiff] that he had authority to enter into a settlement agreement, and then he backtracked, backtracked, backtracked.  And the Postal Service didn't have anything in place to actually provide authority to line attorneys except for procedures that they were not following . . . ."  Tr. at 40:22–41:3.  Even the government agrees, "throwing out numbers is a good way of describing" the Postal Service attorney's method of settlement negotiations.  Tr. at 55:1–2.

given the government is not bound by any agreement with plaintiff because Mr. Tita lacked the requisite settlement authority, plaintiff failed to "show a valid contract" with the government. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

**B.      Whether The "Agreement-in-Principle" Lacked Sufficiently Definite and Material Terms**

Although a lack of requisite settlement authority is independently dispositive, the Court also evaluates whether the parties' agreement in principle evidenced offer and acceptance.  The government asserts "the purported settlement agreement that [plaintiff] alleges existed lacked key terms that remained to be agreed upon" including whether plaintiff will opt for a disability retirement, but instead concerned only the "monetary component" of settlement negotiations. Gov't's MSJ at 12.  Plaintiff maintains, however, "[t]he parties did not start over from ground zero during every settlement discussion," and given plaintiff "submitted a disability retirement application pursuant to [plaintiff's] [s]ettlement" offer, "[plaintiff], at least, understood the settlement discussions to be cumulative."  Pl.'s Resp. at 9–10.

"A contract need not be memorialized in a single document; rather, 'a contract may arise as a result of the confluence of multiple documents' so long as there is 'a clear indication of intent to contract[,] and the other requirements for concluding that a contract was formed' are met."  *Suess v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008) (quoting *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003)).  "In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise."  *Mod. Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed. Cir. 1992).  Contracts must have sufficiently definite terms if they arise "as a result of a confluence of multiple documents" or include all material terms in a single document.[8]  *Suess*, 535 F.3d at 1359.

After plaintiff filed an EEOC grievance in 2018 and the EEOC administrative judge

---

The Court notes it appears the Postal Service attorney, here, did not properly communicate he lacked authority to settle plaintiff's case above $5,000, needed to seek ratification, or received designated authority from his superiors. Although the attorney discussed with plaintiff's counsel a $180,000 settlement—which he never had authority to do—the record here does not appear to show the attorney clarified he was waiting to receive settlement authority after discussing the $180,000 or he followed up with his superiors to receive ratification for the $180,000 settlement offer.  The Court emphasizes, though the government is not bound by contracts where the government actor did not have requisite settlement authority, the government should turn square corners with the people, especially when negotiating settlements with the people who are turning square corners with the government. *See Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (Roberts, C.J.) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) (Gorsuch, J.).

[8] For clarity, one of the central issues here is whether a term about the type of retirement should be included in the settlement agreement.  If the Court were to assume the parties' discussions were cumulative, *arguendo*, because plaintiff's settlement offer only stated "[b]oth parties shall facilitate [plaintiff's] current application for *retirement*," without specifying which type of retirement, the question-at-hand is whether the offer included sufficiently definite terms.  *See* Pl. App'x at 33 (Plaintiff's 7 April 2021 Settlement Offer).  Conversely, if the Court were to assume the parties' discussion were *not* cumulative, *i.e.*, the email exchange regarding the monetary compensation is the entire extent of the settlement offer, then the question-at-hand is whether the settlement offer lacked material terms.  Both scenarios—lack of sufficiently definite terms or lack of material terms—result in the same inquiry of whether the parties' conduct evidenced an offer and acceptance.

issued an order to discuss settlement, the parties commenced settlement discussions. *See supra* Section II. Plaintiff first sent Mr. Tita a settlement offer for compensation in exchange for plaintiff withdrawing the EEOC case and agreeing the Postal Service admitted no fault or liability. Pl. App'x at 33 (Plaintiff's 7 April 2021 Settlement Offer). Importantly, this offer stated the parties "shall facilitate [plaintiff]'s current application for *retirement*" but did not specify whether plaintiff would elect a disability or regular retirement—or whether plaintiff would receive additional compensation from another source. *Id.* (emphasis added). After this settlement offer and a phone call between the parties, plaintiff's attorney asked, "[W]hat is your client's current offer to my client?," to which the Postal Service attorney responded, "$180[,000] inclusive of comp[ensation] and att[orney's] fees." Pl. App'x at 36 (Plaintiff's Counsel 17 May 2021 Email to Postal Service Counsel; Postal Service Counsel's 17 May 2021 Email to Plaintiff's Counsel). There were no other terms in the email. *See id.* According to Mr. Tita's deposition testimony, "[t]he genesis of the Settlement" discussions was the Postal Service being potentially liable "on this [EEOC] Grievance Settlement." Def. App'x at 124:9–10 (Tita Dep. Tr.). Stated differently, in the Postal Service's perspective, the email about $180,000 inclusive of compensation and attorney fees was specifically tied to settling the EEOC grievance claim, "but now [plaintiff] wants the [settlement] money, but then also apply for Disability Retirement to get additional money, which would be double-dipping. It was never contemplated that she would be doing that." *Id.* at 124:11–15.

Terms such as the manner of plaintiff's retirement and whether plaintiff receives compensation from another source may be material terms, and the absence of these terms may preclude contract formation. Tr. at 82:8–13 ("[THE COURT:] So it's a material term as to this contract, how she is retired, or whether or not she receives payment from some other type of settlement. Is that correct? [THE GOVERNMENT]: Yes, that's correct, Your Honor."). At oral argument, plaintiff acknowledged the type of retirement is significant as it affects the amount of monetary compensation. Tr. at 79:20–23 ("[THE COURT:] [T]he difference between the two retirements is significant as far as monetary compensation, correct? [PLAINTIFF]: That's correct.). Based on Mr. Tita's deposition testimony and plaintiff's acknowledgement, plaintiff may receive proceeds through disability retirement different from, and in addition to, a settlement agreement. *Id.*; Def. App'x at 124:9–15 (Tita Dep. Tr.). As a result, definitively knowing whether plaintiff will opt for a disability retirement as opposed to a regular retirement could significantly impact the monetary compensation aspect of the government's settlement offer. Given neither the initial offer nor the email chain explicitly states the type of settlement or whether plaintiff will receive additional compensation, the absence of these terms raises questions about whether all material terms were encompassed in the agreement in principle and whether the absence of these terms can support the rise of binding contractual obligations. *See Mod. Sys. Tech. Corp.*, 979 F.2d at 202.

Comparing plaintiff's initial settlement offer and the email exchanges with the Postal Service's counteroffer on 18 October 2021 is further instructive. While the initial offer and email exchanges did not mention whether the Postal Service attorney had actual authority for the settlement offer, the 18 October 2021 offer specifically noted the Postal Service attorney "received all proper authority to offer . . . [f]ull payment of attorney fees ($22,135.50)" [and] compensatory damage ($40,000)." Pl. App'x at 68 (Postal Service Counsel's 18 Oct. 2021 Email to Plaintiff's Counsel). In addition to stating the attorney had the requisite authority, the

18 October 2021 offer also provided the Postal Service will "[a]ssist [plaintiff] in filing for *disability* retirement," as opposed to the initial offer which did not mention the type of retirement. *Id.* (emphasis added). The 18 October email also contained disclaimers regarding the length of plaintiff's disability retirement, when the disability retirement converts to regular retirement, and the timeframe to apply for retirement. *Id.* Considering plaintiff admitted "it was not specified in the written [initial] settlement offers what type of retirement" plaintiff will elect, despite acknowledging the effect the type of retirement would have on the amount of compensation, *see* Tr. at 80:6–7, it is difficult to see how an email chain discussing monetary compensation, without mentioning the type of retirement or extent of authority, could suffice for an offer with sufficiently definite and all material terms. Further, considering plaintiff knew the type of retirement could affect settlement value, plaintiff appears to recognize *not* including the type of retirement may introduce ambiguities as to overall compensation. This may further indicate the parties' discussions did not result in an agreement containing sufficiently definite terms.[9] Considering the offers may lack sufficiently definite terms (or all material terms), the Court suspects the parties' agreement in principle may not have given rise to contractual obligations. *See Mod. Sys. Tech. Corp.*, 979 F.2d at 202.

## V.      Conclusion

For the foregoing reasons, the Court **GRANTS** the government's Motion for Summary Judgment, ECF No. 37, and **DISMISSES** plaintiff's complaint. The Clerk's Office is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge

---

[9] It behooves plaintiffs to secure a written offer with all material terms from a government acting with actual authority like Mr. Tita offered on 18 October 2021. As the government warned at oral argument, "[plaintiffs] [sh]ould be wary of agreements that are not signed just because that would be much less likely to be approved." Tr at 69:7–8.